**FILED**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

JAN 0 4 2012

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS OFFICE

IN THE MATTER OF THE SEARCH OF )

The entire Alorton Village Hall and Police )
Department located at 4821 Bond Avenue, )
Alorton, IL  62207, including the office of )
the Mayor and all evidence storage )
locations.   The Alorton Police Department )
is located in the basement of the Alorton )
Village Hall.   In addition to the basement, )
one office and a storage closet are )
maintained by the police department on the )
main floor of the Alorton Village Hall.   A )
sign located at the top of the steps of the )
Alorton Police Department indicate )
"Alorton Police Dept.  Lower Level" with )
an arrow pointing to the entrance of the )
Alorton Police Department. )

CASE NUMBER  12-mj-3001-DGW

**FILED UNDER SEAL**

## APPLICATION AND AFFIDAVIT
## FOR SEARCH WARRANT

I, Joseph R. Murphy, being duly sworn depose and say:

I am a Special Agent with the Federal Bureau of Investigation, and have reason to believe

that on the person or premises known as:

The entire Alorton Village Hall and Police Department located at 4821 Bond Avenue,
Alorton, IL  62207, including the office of the Mayor and all evidence storage locations.
The Alorton Police Department is located in the basement of the Alorton Village Hall.   In
addition to the basement, one office and a storage closet are maintained by the police
department on the main floor of the Alorton Village Hall.   A sign located at the top of the
steps of the Alorton Police Department indicate "Alorton Police Dept. Lower Level" with

1

an arrow pointing to the entrance of the Alorton Police Department.  A photo of the subject property is affixed to this application as "Attachment C."

in the Southern District of Illinois there is now concealed a certain person or property, namely:

### SEE ATTACHED LIST, ENTITLED "ATTACHMENT A"

which constitutes evidence of the commission of a criminal offense or which is contraband, the

fruits of crime, or things otherwise criminally possessed, or which is designed or intended for use

which is or has been used as the means of committing an offense in violation of Title 18 United

States Code, Sections 371 (conspiracy to unlawfully obtain a firearm in violation 18 U.S.C.

§922(a)(6) and §924(a)(1)(A)); 641 (theft or conversion of government property); 922(j)

(possession of a stolen firearm); 1001 (making false statements); 1343 (wire fraud); 1519

(obstruction of justice); 1791 (attempting to provide contraband to an inmate of a penal facility in

which persons are held in custody pursuant to an agreement with the Attorney General); 1951

(Hobbs Act); and Title 21, Sections 841(a)(1) and 846 (attempted possession with the intent to

distribute a controlled substance),

The facts to support the issuance of a Search Warrant are as follows:

### SEE ATTACHED AFFIDAVIT OF FBI SPECIAL AGENT JOSEPH R. MURPHY, ENTITLED "ATTACHMENT B"

Stephen Wiggington
United States Attorney

STEVEN D. WEINHOEFT
Assistant United States Attorney

State of Illinois       )
                           )   SS.
County of St. Clair   )

Sworn to before me, and subscribed in my presence on the _4th_ day of _January_,

2012 at East St. Louis, Illinois.

**HON. DONALD G. WILKERSON**
United States Magistrate Judge

**Attachment A**
**Items to be Seized - Alorton Village Hall**
**4821 Bond Ave., Alorton, IL**

1) INVENTORY: This warrant authorizes federal authorities, with the assistance of state or local designees, to conduct a full inventory of all evidence within the control or possession of the Alorton Police Department, including but not limited to United States Currency, controlled substances, and counterfeit or look-alike substances. This warrant permits a search to identify and document the existence of every item of evidence physically present in the Alorton Police Department. Additionally, this warrant authorizes the search and copying of any evidence logs, books, computerized, or other record system used to identify evidence or maintain control over items of physical evidence and photographs, including chain of custody documentation. This inventory includes a review and permits copying of any records showing the transmittal of evidence to other agencies, the Illinois State Police Crime lab, or the St. Clair County State's Attorneys Officer.

2) PARTICULAR CASE EVIDENCE: Any United States Currency, controlled substances, counterfeit or look-alike substances, from the following cases:

      a. May 21, 2011, Report ████████████

      b. May 27, 2011, Report ████████████

      c. July 18, 2010, Report ████████████

      d. March 28, 2011, Report ████████████

      e. April 12, 2011, Report ████████████

      f. April 6, 2011, Report ████████████

      g. April 15, 2011, Report ████████████

      h. July 19, 2011, unknown report number, documenting the seizure of approximately 13 grams of an off-white chunky substance resembling crack cocaine.

      i. All police reports, photographs and seized evidence of any kind in any case that any of the following persons were named anywhere in the reports: ████████████████████ ████████████

3) RECORDS PERTAINING TO THE PURCHASE AND OWNERSHIP OF FIREARMS: All Village of Alorton records pertaining to firearms owned by the Village of Alorton or the Alorton Police Department. This includes an inventory of all firearms purchased by the village, received pursuant to a grant, or obtained as surplus property via the State of Illinois Central Management Systems (CMS). This also includes all property receipts, inventories, or other records accounting for the whereabouts of each village-owned firearm – including records to whom each village-owned firearm is assigned. Any records, memoranda, reports, letters,

**Attachment A**
**Items to be Seized - Alorton Village Hall**
**4821 Bond Ave., Alorton, IL**

complaints or other documentation of firearms stolen from the Village of Alorton, or any of its employees.

4)      COMMISSIONED OFFICERS:   Any record identifying individuals designated as commissioned or auxiliary Alorton police officers from January 1, 2008 to the present.

5)      SURVEILLANCE EQUIPMENT AND RECORDINGS:  All Digital Video Recorders and surveillance recordings.

6)      COMPUTER EVIDENCE:   Alorton police computer equipment used in generating police reports, documenting the seizure or location of physical evidence, and taking or storing photographs; and computer equipment stored in evidence, including:

      a.  PERSONAL ELECTRONIC MEDIA:  Telephones, fax machines, speed dialers, cellular telephones, smart phones, PDA's, digital pagers, voice pagers, alpha-numeric display pagers and all information stored therein, either written or electronic – including text messages, emails, address books, calendars, and photographs/videos.

      b.  COMPUTER HARDWARE: Computer hardware, including data-processing devices (such as central processing units, desktop computers, self contained "laptop" or "notebook" computers); internal and peripheral storage devices (such as fixed disks, floppy disks, external hard disks, floppy disk drives and diskettes, tape drives and optical storage devices, thumb-drives, and other memory storage devices); Microsoft consoles (S/N's: 607905110205, 608199210205, 608095710205, 608250710205); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communications devices (such as modems, routers, cables and connections, recording equipment, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices); as well as any devices, mechanisms, or parts, that can be used to restrict access to computer hardware (such as physical lock and keys).

      c.  COMPUTER SOFTWARE:  Computer software, including programs to run operating systems, applications, utilities, compilers, interpreters, video, web browsers, and communications programs.

      d.  COMPUTER DOCUMENTATION:   All computer-related documentation including written, recorded, printed, or electronically-stored material which explains or illustrates how to configure or use computer hardware, software, or other related items.

      e.  PASSWORD AND SECURITY INFORMATION:  All computer passwords and data security devices, including encryption devices, chips and circuit boards.

**Attachment A**
**Items to be Seized - Alorton Village Hall**
**4821 Bond Ave., Alorton, IL**

7)    TIF RECORDS:  From the time period beginning, January 1, 2008 and continuing through January 4, 2011,

      a.  All information pertaining to redevelopment project areas (a/k/a, "TIF" Districts) required to be reported annually to the Illinois State Comptroller, pursuant to 65 ILCS 5/11-74.4-5, including the following:

          (1)  Any amendments to the redevelopment plan, the redevelopment project area, or the State Sales Tax Boundary;

          (2)  A list of the redevelopment project areas administered by the municipality and, if applicable, the date each redevelopment project area was designated or terminated by the municipality;

          (3)  Audited financial statements of the special tax allocation fund (after a cumulative total of $100,000 has been deposited in the fund);

          (4)  Certifications of the Chief Executive Officer of the municipality that the municipality has complied with all of the requirements of the "Illinois Tax Increment Allocation Redevelopment Act" during the preceding fiscal year;

          (5)  All publicly filed opinions of legal counsel that the municipality is in compliance with this Act;

          (6)  Any analysis of the special tax allocation fund which sets forth:

               (a)  the balance in the special tax allocation fund at the beginning of the fiscal year;

               (b)  all amounts deposited in the special tax allocation fund by source;

               (c)  an itemized list of all expenditures from the special tax allocation fund by category of      permissible redevelopment project cost.

               The includes a detailed summary of municipal or privately reimbursed expenditures to date related to each TIF District; and

               (d)   the balance in the special tax allocation fund at the end of the fiscal year including a breakdown of that balance by source and a breakdown of that balance identifying any portion of the

**Attachment A**
**Items to be Seized - Alorton Village Hall**
**4821 Bond Ave., Alorton, IL**

balance that is required, pledged, earmarked, or otherwise designated for payment of or securing of obligations and anticipated redevelopment project costs. Any portion of such ending balance that has not been identified or is not identified as being required, pledged, earmarked, or otherwise designated for payment of or securing of obligations or anticipated redevelopment projects costs shall be designated as surplus as set forth in Section 11-74.4-7;

(7)    A description of all property purchased by the municipality within the redevelopment project area including:

        (a)  Street address;

        (b)  Approximate size or description of property;

        (c)  Purchase price; and

        (d)  Seller of property.

(8)    A statement setting forth all activities undertaken in furtherance of the objectives of the redevelopment plan, including:

        (a)  Any project implemented in the preceding fiscal year;

        (b)  A description of the redevelopment activities undertaken;

        (c)  A description of any agreements entered into by the municipality with regard to the disposition or redevelopment of any property within the redevelopment project area or the area within the State Sales Tax Boundary;

        (d)  Additional information on the use of all funds received and steps taken by the municipality to achieve the objectives of the redevelopment plan;

        (e)  Information regarding contracts that the municipality's tax increment advisors or consultants have entered into with entities or persons that have received, or are receiving, payments financed by tax increment revenues produced by the same redevelopment project area;

        (f)  Any reports submitted to the municipality by the joint review board;

**Attachment A**
**Items to be Seized - Alorton Village Hall**
**4821 Bond Ave., Alorton, IL**

      (g)    A review of public and, to the extent possible, private investment actually undertaken to date after the effective date of this amendatory Act of the 91st General Assembly and estimated to be undertaken during the following year. This review shall, on a project-by-project basis, set forth the estimated amounts of public and private investment incurred after the effective date of the "Illinois Tax Increment Allocation Redevelopment Act" and provide the ratio of private investment to public investment to the date of the report and as estimated to the completion of the redevelopment project;

   (9)   With regard to any obligations issued by the municipality:

      (a)   copies of any official statements; and

      (b)   an analysis prepared by financial advisor or underwriter setting forth: (i) nature and term of obligation; and (ii) projected debt service including required reserves and debt coverage; and

   (10)   For special tax allocation funds that have experienced cumulative deposits of incremental tax revenues of $100,000 or more, a certified audit report reviewing compliance with "Illinois Tax Increment Allocation Redevelopment Act" performed by an independent public accountant certified and licensed by the authority of the State of Illinois, including a letter from the independent certified public accountant indicating compliance or noncompliance with the requirements of subsection (q) of Section 11-74.4-3.

  b.  Any information pertaining to the "Joint Review Board," that is required to meet annually to review TIF district activities, including but not limited to the following:

   (1)   Minutes from Joint Review Board meetings;

   (2)   The date and location for each Joint Review Board meeting;

   (3)   Copies of any reports submitted to the Joint Review Board for their consideration, including but not limited to: Annual TIF reports required to be created and supplied to the Joint Review Board and impacted taxing districts, pursuant to 65 ILCS 5/11-74.4-5;

   (4)   Reports generated by the Joint Review Board; and

**Attachment A**
**Items to be Seized - Alorton Village Hall**
**4821 Bond Ave., Alorton, IL**

    (5)    The names, addresses and phone numbers of all persons serving on the Joint Review Boards.

c.  All audits or summaries conducted upon any Alorton redevelopment project areas (a/k/a, "TIF" Districts), including but not limited to:

    (1)    Municipal audits;

    (2)    Independent Certified audits, including the letter from the independent certified public accountant indicating compliance or noncompliance with the requirements of subsection (q) of Section 11-74.4-3 of the "Illinois Tax Increment Allocation Redevelopment Act;"

    (3)    Redevelopment project audits from individual projects; and

    (4)    Activity statements summarizing the activities undertaken each fiscal year to further the TIF redevelopment plan goals and objectives.

d.  Financial Records for all Alorton redevelopment project areas (a/k/a, "TIF" Districts), including but not limited to:

    (1) Budgets for any TIF district;

    (2) Revenues and receipts, including but not limited to: property tax increment, local and state sales tax increment, interest, bond proceeds, fund transfers, and other revenue;

    (3) Expenditures, including: fund transfers, expenditures by cost category, administration costs, marketing, and by significant vendor payments (paid $5,000 or more, cumulative payment from the inception of the first Alorton TIF district);

    (4) Account statements for any bank account to which TIF monies are deposited or withdrawn; and

    (5) Copies of County Treasurer's Office receipts related to incremental tax revenues received by the municipality.

e.  All TIF project proposals, requests to contract, or other project applications that were denied, rejected, or otherwise not accepted or approved.

f.  Studies, reports, capital improvement plans, project feasibility studies of any kind to existing or anticipated redevelopment projects within each TIF District, or other evidence that the city of Alorton established an objective, bona fide, need for services prior to contracting for services within the TIF District.

**Attachment A**
**Items to be Seized – Alorton Village Hall**
**4821 Bond Ave., Alorton, IL**

g.  All TIF project records and complete vendor files, including but not limited to the following information:

    (1)  <u>APPLICATIONS</u>:  All TIF project proposals, applications, agreements, contracts or other requests to contract that were accepted by the city of Alorton.

        This request includes the applications as well as any supporting documentation, including: business plans, project summaries, cost estimates or projections, project budgets, schedule of expenses, schedule of sources of funding for projects, and future income projections;

    (2)  <u>COMPETITIVE BIDDING</u>:  Bid proposals, bid documentation, requests for proposals, public notifications, or other evidence of an open, competitive bid process;

    (3)  <u>COMPLETION VERIFICATIONS FROM THE TIF RECIPIENT</u>: Construction schedules, construction reports, field reports, progress reports, verifications or other documentation from the vendor purporting to establish that the contracted work was actually performed;

    (4)  <u>COMPLETION VERIFICATIONS FROM THE VILLAGE OF ALORTON</u>:  Progress verifications, progress reports, inspection reports, photos, completion verification, or other evidence from the city of Alorton verifying that that the contracted work was actually performed prior to payment; and

    (5)  <u>PAYMENT DOCUMENTATION</u>:  Documents (checks, debit memos, cash in tickets, wires in, etc.) reflecting the means by which TIF payments were made, including records revealing the date, amount and method of payment;

**Attachment C**
**Photos of Alorton Village Hall**
**4821 Bond Ave., Alorton, IL**





**Attachment B**
**Affidavit Of Joseph R. Murphy**

| | |
|---|---|
| STATE OF ILLINOIS | ) |
| | )  ss. |
| COUNTY OF ST. CLAIR | ) |

I, JOSEPH R. MURPHY, under the penalty of perjury declare that I am over the age of eighteen and the information set forth in this Affidavit is true and correct to the best of my knowledge and belief:

## Introduction:

1.      I am a Special Agent (S/A) with the Federal Bureau of Investigation (FBI) and have been so employed for nearly thirteen years.  Prior to joining the FBI, I had eight years of prior law enforcement experience as a police officer and detective with the Metropolitan Police Department, City of St. Louis, Missouri.  I am currently assigned to the Springfield Division of the FBI, Fairview Heights Resident Agency (FHRA), Metro-East Public Corruption Task Force (MEPCTF), and as such am vested with the authority to investigate violations of Federal criminal laws, including Titles 18 and 21, United States Code. I have primary investigative responsibilities for crimes occurring in the Southern District of Illinois.  Affiant has been assisted in this investigation by the Internal Revenue Service/Criminal Investigations, as well as by other members of the FBI, and the Illinois State Police.  This Affidavit is made in support of a warrant to search for and seize evidence.  Because this affidavit is submitted for the limited purpose of establishing probable cause to obtain a search warrant, I have summarized a number of investigative findings, but I have not included the details of every aspect of the investigation.

1

2.     During the course of this investigation, several sources of information have been utilized, including but not limited to: the investigation of your Affiant, information derived from police reports, surveillance, covert audio and video recordings, an undercover law enforcement officer, interviews of law enforcement officers, interviews of witnesses/complainants, public records, surveillance, the work of other members of the investigative team, Confidential Human Sources, and other cooperating officers. All of the information contained in this affidavit is based on the personal knowledge of your affiant and the investigative sources of your affiant or was relayed to your affiant by other members of the investigation team. The facts to support the issuance of a search warrant for the premises described above are as follows:

**<u>Background</u>:**

3.     Randy McCallum, Sr. was elected mayor of the Village of Alorton (VOA) in April, 2005, by defeating incumbent mayor Carolyn Williams. Through surveillance, witness statements and a search of public records, your Affiant has confirmed that Randy McCallum lives at ▮ So. 42nd Street, Alorton, Illinois.

4.     Robert L. Cummings joined the Village of Alorton Police Department (VOAPD) in 1999, and was appointed Chief of Police by Randy McCallum in 2006. Robert L. Cummings remained in that position until he pled guilty in US District Court for the Southern District of Illinois on February 24, 2011, for filing false tax returns from 1999-2006.

5.     Mayor Randy McCallum appointed Michael Baxton as the VOA police chief. Baxton served as the VOA chief of police until October 14, 2011, when the Illinois Law Enforcement Training and Standards Board decertified Baxton as a police officer due to two felony convictions from 1982 (theft of more than $150, in Madison Co. case 81-CF-751; and

2

burglary, in Madison Co. case 81-CF-752). When Baxton was decertified, Mayor Randy McCallum appointed Gerald Crenshaw as the interim chief of police for the VOA. On November 17, 2011, a St. Clair County judge reinstated Baxton's law enforcement credentials because his felony convictions had been expunged in 1989. After being reinstated, Baxton was hired by the City of East St. Louis to be that city's police chief on November 30, 2011. Baxton has worked for various municipal police departments in St. Clair County, Illinois beginning in 1994. He has served as the Chief of Police Alorton, Brooklyn, and East St. Louis, Illinois. Baxton has also held other positions in law enforcement throughout the St. Louis, Metro east area. Baxton also worked as an attendance officer for the Cahokia Illinois School District and did work for the State Appellate Defender's Office as a Death Penalty Trial Assistant. While working as a police officer for at least one department Baxton was also a member of the Major Case Squad. Crenshaw remains the chief of the VOAPD as of the date of this application.

6.      Robert L. Cummings has a brother named Ronnie Cummings. Ronnie Cummings has prior felony convictions for possession of a controlled substance from 2001, and manufacture or delivery of a controlled substance from 2002. He was sentenced to 4 years in the Illinois Department of Corrections. Despite that conviction, Randy McCallum appointed Ronnie Cummings to be the VOA Street Superintendent.

7.      Harry A. Halter, Jr. has served as a police officer in Fairmont City and has served as the Public Safety Director for the VOA. Halter owns a local towing and mechanic business named Town & Country Towing, which until recently received nearly all of the VOA's towing business. Halter was arrested on September 24, 2011, for official misconduct charges brought in St. Clair County Court relating to Halter receiving oral sex from a woman in exchange for not arresting her for driving with a suspended license. Halter was placed on administrative leave

3

from the VOA on that date. Halter is also facing prosecution in federal court for two unrelated federal criminal matters (wire fraud for misapplying funds administered by the VOA tax increment financing (TIF) program; and tax offenses related to both his personal and business finances). ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████

### Beginning of the Investigation:

8.     Prior to the start of the investigation, federal law enforcement received allegations that Alorton Mayor Randy McCallum was using his position to provide favorable treatment to his friends and family members and to protect his own drug business. When the allegations were first received, ████████████████████████████████████████ Thereafter, over a period of time ████████████████████████ and a formal investigation was opened. During the course of the investigation, ████████████████████

████  ████████████████████████████████████

████████  ████████████████████████████

      ██  ██████████████████████████

          ███████████████████████████

      ██  ████████████

      ██  ██████████████

9.     On January 30, 2009, ████████████████████████ was interviewed. ██

███████████████████████████████████████████

4



██████ stated that shortly after being elected, Randy McCallum formed a group of police officers who called themselves the "stunt crew," who conducted pro-active law enforcement activities targeting gun and drug offenders. ████ stated that Mayor McCallum has a ████ named ████ ████ ██████████ that are well known drug dealers in the Alorton community. These two individuals are identified as ████████████ and ██████████. ████ ████████ and █████████ ████ are █████████████████ ██████ ████ advised that Randy McCallum was using the police department to shut down drug dealers who were competing with ████ ████████

10.   ████ ████ stated that Randy McCallum controlled the distribution of Tax increment Financing (TIF) funds within the VOA. ████ stated that Randy McCallum used those funds to reward his allies, which was a great source of power within the VOA. ████ stated that TIF awards were routinely given out as "gifts," and that recipients did not have to prove that any improvements were actually made. The recipients were not require to repay the funds, even when the repairs were not made. On April 23, 2010, ████ was interviewed ████ and █ further opined that the TIF program had serious problems. ████ reported that ██ had knowledge that several persons received TIF funds but did not have the work done or were required to provide a kickback to Mayor Randy McCallum, including the following:

    a.   ███████████████████ had to give money back to the mayor. ████ ████ █ got $4,000 and had to kick back $2,000 to the mayor. ██████████ was complaining about the matter. ████ ████ knew him by the nickname of "██████████

    b.   ████ stated that several of McCallum's ██████████ received TIF awards, including █████████████████ as well as McCallum's ████ and ██████



c. █████████ the owner of a █████████

d. █████████ was alleged to be a relative of McCallum who also works at the VOA. █████ was alleged to have taken his family on a vacation █████████ with the TIF award that he received.

e. Businessman Harry Halter was alleged to have received TIF funds for a fence and that he never completed the work.

f. █████ personally applied for and received TIF funds. █████ stated that █████ received TIF funds, despite █ history of political █████████ to █████ because █ had knowledge of his corruption and McCallum feared that █████ may report the matter.

g. █████ also stated that the owner of the "█████████," asked █████ what was going on at the VOA because his store was running out of cash and he needed to go to the bank because so many people were cashing $4,000 checks from the VOA. (It is well known to your Affiant that █████████ is a popular location for VOA residents to cash checks.)

### **Tax Increment Financing:**

11. Tax Increment Financing (TIF) is a form of local financing that allows local governments to invest money into private developments occurring within identified "blighted" geographical areas, with the spending being paid for with debt financed through anticipated future tax revenues that are expected to be generated as a result of the new development. Improving blighted areas oftentimes requires public investment to spur economic development because these areas offset the extra costs and risks that private developers are usually unwilling to incur. Because TIF financing relies on leveraging future tax revenues, municipalities are enabled to make the improvements, like new roads or sewers, and provide incentives to attract new businesses or help existing businesses stay and expand without expending general municipal revenues or raising taxes.

12. The VOA has established a TIF district, pursuant to the Illinois' Tax Increment Allocation Redevelopment Act. The TIF district is supported in large part by tax revenues

6

generated by a local business named "The Flying J." TIF funds received by the VOA must be spent on TIF-eligible costs, as defined by Illinois law, such as: property acquisition, construction of public works or improvements, demolition, rehabilitation of existing public or private buildings, etc. However, evidence has been developed that Randy McCallum awards TIF funds to political allies or personal friends who in turn kickback a portion of the TIF funds to McCallum. The TIF recipient does not use the funds for their intended purpose and the recipient's property is not inspected by the VOA.



13. On October 2, 2009, then ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ met with federal agents and prosecutors for an interview related to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮. ▮▮▮▮▮▮▮▮ was not represented by counsel and ▮▮▮ statements were not protected by a proffer agreement. ▮▮▮▮ ▮▮▮▮▮▮ advised that the mayor decides who receives TIF funds and that Randy McCallum often receives kickbacks in exchange for TIF funds. ▮▮▮▮▮ advised that ▮▮ ▮▮▮ ▮▮▮▮ ▮▮▮▮▮ received TIF funds in the amount of $2,500 - $3,000 and that ▮▮ was required to give $1,000 back to Randy McCallum. ▮▮▮▮▮▮▮▮ said he knew this to be true, because ▮▮▮▮▮▮▮▮▮▮▮▮▮ served as a middle man to deliver the kickback to the mayor. On June 16, 2010, ▮▮▮▮▮▮▮▮ was subpoenaed to testify before the Federal Grand Jury sitting in East St. Louis, Illinois. In addition to being questioned about ▮▮▮▮ ▮▮▮▮▮▮▮ ▮ ▮▮▮▮ ▮▮▮▮ ▮▮▮▮▮ was asked about whether ▮▮ had received any TIF funds. ▮▮▮▮ ▮▮▮▮▮ was initially evasive, but ▮▮ ultimately admitted that ▮▮ received $4,000 in TIF funds from the VOA and that ▮▮ was required to kickback $1,000 of the money to Mayor McCallum. ▮▮▮▮ testified that ▮▮ gave the money to ▮▮▮▮▮▮▮▮▮▮▮▮ to deliver to the mayor on ▮▮ behalf. However, ▮▮ stated that ▮▮ knew McCallum received the money because ▮▮ ▮▮▮▮▮▮▮▮▮▮ McCallum verified that he had received ▮▮

7

payment. █████████ also acknowledged that ████████ and Randy McCallum are ███ friends.

14.    On October 2, 2009, ████████████ advised that Harry Halter received TIF funds to construct a fence around his business, Town & Country Towing, but that Halter had kept the money without building the fence. ██████, and ███████████, had previously made the same accusation. Further investigation confirmed the allegation to be true. Village records confirmed that on December 2, 2008, Halter completed and signed an application for TIF funding from the VOA. In that application, Halter sought $25,000 purportedly for the construction of a new fence to surround the perimeter of the property of Town & Country Towing, located at 4975 Bond Avenue, Alorton, Illinois. According to the TIF application, construction on the fencing was scheduled to begin on January 5, 2009, and be completed by February 15, 2009. The Village of Alorton approved Halter's TIF application, and on January 29, 2009, the village issued a check in the amount of $24,990 for the construction of 750 linear feet of fencing around Town & Country Towing. On February 2, 2009, that $24,990 check was deposited into Region's Bank account ██████████ owned by "Harry A. Halter, DBA Town & Country Towing." In the time period beginning January 1, 2009, through March 31, 2009, Halter spent $5,932.38 of the TIF funds on materials related to the construction of the fence. However, rather than using the remaining $19,057.62 as intended, Halter converted those funds to pay personal expenses and business expenses unrelated to the construction of the fence, such as checks to pay personal credit cards and checks to pay Kinkaid Village Marina for personal recreational boating expenses. █████████████████████

████████████████████████████████  █████  █████████

████████████████████████████████████████

██████ ██████ Halter's checking account records did reflect an $800 payment to Randy McCallum in April, 2009. ████████████████

████████████████████████████████████

████████████████

15. On October 2, 2009, ████████████ stated that Randy McCallum's ██████ named ████████ received TIF money.

16. On October 2, 2009, ████████████ also confirmed that Randy McCallum interferes with police decisions concerning who to arrest and ticket. ████████ stated that McCallum voids tickets for neighbors and friends and directs the police on how to exercise their arrest authority. ████████████ quoted the mayor as saying, "I run this motherfucker," when referring to his authority over the village and the police department.

17. On October 2, 2009, ████████████ discussed the fact that Randy McCallum's son, Randy McCallum, Jr. had left town and he was hiding at a relative's house because he was being sought in connection with a double murder that occurred in Washington Park in September. ████████ advised that Randy McCallum Jr. is "good for it;" meaning that Randy McCallum's son committed the murders.

18. On April 13, 2010, ████████ stated that ████████████████ complained that ████████ received a $1,600 TIF award for ████████████ in his yard, but that they had to give the mayor $1,000 back, which left only $600 ████████.

19. On May 17, 2010, ████████████ participated in a ████ interview with federal investigators and one AUSA. This time ████████ was represented by counsel and █ ultimately executed a proffer agreement. In that meeting ████████ alleged that the cash deposits to the VOA were being stolen. ████████████ allegation regarding cash thefts was

9

supported by a village audit conducted by J.W. Boyle & Co., Ltd. The accounting firm expressed concern over the absence of any cash being deposited into the village accounts. The accountants noted that it was impossible that the village didn't occasionally come into cash receipts.

████████ further stated that a ██████████ named ██████████ had contacted McCallum about being sponsored for the 40 hour firearms training course required as a prerequisite to full-time police employment. McCallum told ████████ that he would meet with him, and that ████████ "needed to bring his checkbook." ████████ also said that Michael Baxton is on the police roster being paid, but that he isn't working for the VOA. Rather, ████████ stated that Baxton was serving as an investigator for the defense attorney representing the mayor's son, Randy McCallum, Jr., who was formally charged with first degree murder for the September 18, 2009, murder of Kevin McVay and Charles Black occurring in Washington Park.

20.   On November 16, 2011, and November 21, 2011, federal agents and prosecutors met with ████ ████ and ██ attorney for an interview according to the terms of a negotiated proffer letter. ██████ admitted that he misapplied TIF funds ██████████████



██████████ stated that it is common practice in the VOA for people to receive TIF money and use those funds for other purposes. ██████ provided agents with a list of people who have engaged in similar conduct, including:

    a.  ██████████, ██████████████ allegedly received $25,000 - $29,000 for ████ █ ████████ that he owns, but ██████████ was never ██████



b. The operator of ▮▮▮▮, who goes by the name of ▮▮▮▮ received approximately $20,000 purportedly to construct ▮▮▮▮; but ▮ used the money for other expenses. ▮▮▮▮ stated that ▮▮▮▮ had been approved for $29,000 but only $20,000 was dispersed, so it is likely that someone stole $9,000.

c. ▮▮▮▮ received $4,000 and took his family to ▮▮▮▮

d. A woman with the last name of ▮▮▮▮ received $4,000 - $5,000 for ▮▮▮▮ repairs that were never done.

21.    On April 7, 2010, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮, provided the agents with a three page list of TIF projects that ▮ stated had not been completed.

22.    A ▮▮▮ named ▮▮▮▮, who ▮▮▮▮▮▮▮▮▮▮▮▮▮▮, was interviewed on April 16, 2010. ▮▮▮▮ repeatedly denied applying for TIF funds while interviewed. ▮ persisted in ▮ denials until agents confronted ▮ with application paperwork that ▮ signed seeking TIF funds purportedly to ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮ ▮▮▮ ultimately admitted that ▮ sought the money to ▮▮▮▮▮▮▮▮, but ▮ spent the money on other items. ▮▮▮▮ denied paying kickbacks to anyone at Alorton.

23.    TIF awards from the VOA involve the transfer of funds, the issuing and cashing of checks, that involve foreseeable interstate wire transmissions that involve interstate banking channels.

**Misuse of the Authority of the Alorton Police Department:**

24.    ▮▮▮▮ has provided your Affiant with numerous examples of cases where the mayor or the chief of police have intervened to provide favorable treatment to arrestees who are family members or associates of the mayor or the chief. Further, your Affiant has developed a

11

substantial number of complaints regarding a serious problem with seized evidence, including guns and drugs disappearing from the VOAPD.

25.    On June 8, 2011, ███████████ described a problem with evidence from the VOAPD not being sent to the Illinois State Police (ISP) for testing. ███████████ stated that since 2010, to the best of ██ knowledge that no drugs have been submitted to the ISP laboratory from the VOAPD.



26.

27.

███████ ███ understood ██████ to be saying that you do not mess with the mayor's friends or family.

28.    On March 31, 2011, ██████ stated that approximately two weeks earlier that an Alorton police officer (██████████ responded to a domestic disturbance call. During the call, the officer patted the suspect down and discovered gun in his possession. A trace of the weapon revealed that the firearm was registered to the Alorton Police Department. The mayor

told the responding officer to drop the matter and the subject was not charged with any criminal offenses. The gun was last known to be in the chief's office.

29. On March 31, 2011, ▇▇▇▇ stated that had a conversation with ▇▇▇▇ who told him/her that a ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, was caught with 27 individually wrapped bags of marijuana. ▇▇▇▇ stated that ▇▇ resisted arrest and fought with ▇▇▇▇▇▇ during the encounter. ▇▇▇▇ advised that ▇▇▇▇▇▇ has a ▇▇▇▇▇▇ relationship with the mayor's ▇▇▇▇ ▇▇▇▇▇▇▇▇ ▇▇ was held on an outstanding warrant from ▇▇▇ County, Illinois, but he was not charged with the marijuana or the assault because the mayor told the police officer not to charge him. ▇▇▇▇ said that the location of the 27 bags of marijuana is unknown.

30. On March 31, 2011, ▇▇▇▇ also stated that ▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇were dealing drugs outside directly behind the mayor's home.

31. On June 18, 2011, ▇▇▇▇▇▇ met with your Affiant to express concern that drugs and guns are missing from the VOAPD evidence area. ▇▇▇▇▇▇ believes that the mayor and Chief Baxton are stealing evidence for their personal use and/or profit. ▇▇▇▇▇ provided your Affiant with the computerized police reports for seven specific cases that would illustrate the problems at the VOAPD. Those cases are as follows:

   a. May 21, 2011, Report ▇▇▇▇▇ ▇▇▇▇▇▇ arrested a driver at checkpoint and marijuana was booked into evidence. No warrants were sought by the VOAPD and the evidence was not sent to the Illinois State Police (ISP) forensic laboratory for testing. ▇▇▇▇▇ was told that the matter was "squashed" because the arrestee was a family member of East St. Louis Mayor Alvin Parks. ▇▇▇▇▇▇▇▇▇▇▇ Two days after this particular arrest, ▇▇▇▇ asked Chief Michael Baxton whether there was any evidence that needed to go to the lab, and Chief Baxton said "no."



b. May 27, 2011, Report ███████ ██████ conducted a traffic stop and seized a large bag of marijuana and $116, and issued traffic citations. The driver was also wanted for an outstanding arrest warrant. The tickets were torn up and the drug evidence was not sent to the ISP crime lab. The arrestee was only booked on the warrant because he was a friend of Chief Baxton. The evidence subsequently could not be located.

c. July 18, 2010, Report ████████ ███████████ conducted a traffic stop and seized marijuana from a subject who had 2 prior drug arrests. The entire file is missing and no evidence was sent to the lab.

d. March 28, 2011, Report ███████ ███████████ arrested a defendant named ██████████ and seized 25 bags of marijuana. ████████ was also arrested, but given an NTA (notice to appear). No warrants were sought by the VOAPD, and the evidence was never sent to the lab. In fact, the evidence sheet and photographs of the evidence are missing. ███████ indicated that ████████ is allegedly related to Mayor McCallum. ████████████████████████████████████████ ████████████████████████████████████ ████████

e. April 12, 2011, Report ██████████ ████████████ conducted a traffic stop and seized marijuana. No warrants were applied for by the VOAPD and no evidence was ever submitted to the ISP lab.

f. April 6, 2011, Report ██████████ █████████████████ conducted a traffic stop on a driver who was wanted on a warrant and seized 15 individually wrapped bags of marijuana. No warrants were applied for and no evidence was conveyed to ISP lab.

g. April 15, 2011, Report ████████ ████████████████ and ████████ arrested two subjects – one for crack, one for marijuana. No warrants were applied for, and no evidence sent to ISP lab.

32.    ████████████ explained the process for seizing evidence within the VOAPD as follows: after an officer seizes evidence at the scene, the officer is responsible for completing an evidence inventory sheet. That sheet is attached to the evidence bag that secures the seized item. The evidence bags and evidence sheets are then dropped into a locked evidence cabinet. The only person with access to that cabinet is the chief of police. After the chief collects the

14



evidence, he turns it over to the assistant chief who is responsible to transport items to the ISP crime lab for processing.

33. On March 28, 2011, ▮▮▮▮ reported that ▮▮▮▮ arrested ▮▮▮▮ and ▮▮▮▮. ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮ seized a large plastic bag containing 25 smaller bags of marijuana and United States Currency bundled in fives, tens, and twenty dollar bills. ▮▮▮▮ completed a police report and booked the drugs and money into evidence. Your Affiant knows this to be common evidence of drug distribution. ▮▮▮▮ advised that ▮▮▮▮ sustained injuries during the arrest requiring treatment at Touchette Hospital. The case was not referred to the St. Clair County States Attorney's Office for prosecution because the mayor told then Chief Baxton to drop the matter.

Your Affiant spoke to ▮▮▮▮ and asked about this incident. ▮▮▮▮ confirmed the details of the arrest, and that he had completed a report and booked the marijuana and US Currency into evidence at the VOAPD. ▮▮▮▮ said that the police report can no longer be located in the VOAPD computerized reporting system and the evidence cannot be accounted for. Later, ▮▮▮▮ asked Chief Baxton about ▮▮▮▮ ▮▮▮▮ the status of the prosecution of the case. Chief Baxton told ▮▮▮▮ not to pursue ▮▮▮▮ and to drop the matter. ▮▮▮▮ believes Mayor McCallum directed the chief not to charge the subjects and the marijuana either be returned to the subjects or given to Mayor McCallum. ▮▮▮▮ opined the mayor is covering for his family members and the evidence has been possibly removed illegally from the evidence area.

34. ███████ reported that on July 7, 2011, that ████████████████████ made an arrest of three subjects ████████████████████████████ for possession of 3 pounds of marijuana. ███████ took a videotaped statement from each suspect. ███████ admitted ownership of 2 pounds and ███████ admitted to being responsible for the third pound. One of the arrestees, ████████████ is a ██████ of Randy McCallum. ████████████████████████

██████ ████████████████████████████

████████████████████████████████████

██████████████████████ Baxton then told the mayor that ███████ should be fired because he knew that the subject was McCallum's nephew when he obtained the warrant. Ronnie Cummings contacted ██████ and told him ██████ was going to lose his job for getting a warrant on McCallum's nephew. ████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████

35. On October 14, 2011, ████████ ████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████ ████████████████████

████████████████████████████████████

████████████████████████████████████

16

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████  ████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████

████████████████████████

36.  ██████ has recently worked ████████████████████████████████

████████████████████████████████ has been utilized by the FBI since ██████ and ██████████

has provided reliable information corroborated by numerous consensual recordings and physical

evidence.

37.  However, ████████████████████████████████████████████████

████████████████████████████████████████████████████████  ████

████████████████████████████ is not the subject of any criminal investigations and he/she agreed

to cooperate in a covert capacity because ████████████████████████████████████

████████████████████████ recognized that the VOA was experiencing a substantial problem with

internal corruption.

38.     ████████████████████████████ recalled that Mayor Randy McCallum got him/her a job with ████████████████████ ████████████████████████ ████████████████████████████████████████. Mayor McCallum required ██████ to provide him payment in the amount of his first check in exchange for getting ████████ the job at ██████████.

39.     Mayor McCallum also got a job for ████████████████████████ ████████ █ ████████████████████████████████████████ ████████████████ Mayor McCallum similarly required ████████████ to pay McCallum his first check in exchange for helping him get a job.

40.     During April - May 2009, ████████ reported that that Mayor McCallum wanted to hire ████████████████████████ However, VOA Mayor McCallum stipulated that ████████'s first check and eight hours of overtime would have to be kicked back to McCallum once ██████ was hired. ██████ █ ████████████████

41.     ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████

42.     ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████



43.     ▮▮▮▮ began working in an undercover capacity and provided a significant amount of information during the course of the investigation. ▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮ ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮

### <u>Mayor Randy McCallum Directs ▮▮▮ to Engage in Unlawful Conduct:</u>

44.     On or about March 2, 2011, ▮▮▮▮ was working at the VOAPD as an officer, however, he was still riding with a field training officer (FTO) and was not patrolling in his/her individual capacity.  While still being supervised by an FTO, ▮▮▮▮ was approached by Ronnie Cummings who advised ▮▮▮▮ that once he/she was riding in a squad car without supervision that he/she would have to "pull some licks" and split the proceeds.  This conversation occurred approximately two weeks before ▮▮▮▮ was scheduled to begin riding alone.  A "lick" is a well-known slang term used on the streets that often refers to a robbery, theft or other situation

19

where a person comes into money. When one "pulls a lick" or "hits a lick," it means that they have committed a robbery.

45.   On May 27, 2011, █████ conducted a traffic stop which resulted in the arrest of a subject in possession of 1(one) large bag of marijuana, ████ in U.S. Currency, and a box of sandwich bags. █████ completed his/her investigation to include securing the evidence into the evidence safe. The mayor heard about the arrest and contacted █████ The mayor told █████ when you get the "motherload" bring it to me. █████████ your Affiant that there is no reason that the mayor should have any contact with items of evidence and that therefore he opined that the mayor would keep any drugs and money that were brought to him. To date, █████ advised no warrants have been applied for and the evidence from his seizure has not been conveyed to the ISP crime laboratory for testing.

46.   On or about June 6, 2011, █████ was inside Mayor McCallum's house, located at █So. 42nd Street, Alorton, Illinois. The two were talking, and McCallum mentioned that he had no money. Mayor Randy McCallum told █████ that he wanted to put █████ "on a lick" and that they would talk more about it later. McCallum told █████ to come back the next day. █████ acted receptive to McCallum's comments.

47.   In a conversation on June 7, 2011, McCallum told █████ that the lick involved a drug dealer named "Wolf" coming into Alorton to engage in weekly 20 lb. marijuana deals. █████ understood McCallum to mean that he wanted █████ to use his position as a police officer to make a traffic stop and take the marijuana from the drug dealer and then give the drugs to the mayor. On the morning of June 7, 2011, McCallum let it be known that he was going to get ahold of █████ later about the identity of the drug dealer who would need to be stopped - but that he was busy trying to get air conditioner repaired at a shop that McCallum owns in

20

Alorton. At approximately noon on June 7, 2011, ███████ received a phone call from the mayor's secretary and was told to work from 3-6 PM. Since ███████ was not previously scheduled to work, CHS #1 believed that he was being called in to complete the planned robbery.

███████ came to the police station that afternoon, and the mayor and three ███████ (known drug dealers from law enforcement intelligence) left together in a black SUV to look at a house. ███████ believed they were checking to see if the drugs had arrived.

The FBI, IRS and ISP conducted extensive ███████ surveillance during the remainder of ███████ shift in case the mayor was able to identify the drug dealer and then directed ███████ to rob that person. ████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

██████████████████

Ultimately, McCallum did not identify the target and the robbery did not happen. McCallum and Ronnie Cummings were seen together at the end of ███████ shift at a store that McCallum owns. McCallum told ███████ that an air conditioner repairman was called to the store. McCallum commented that he needed money.

48.    Federal authorities decided to conduct a proactive integrity-test operation June 15, 2011. The ISP agreed to supply an undercover officer from another geographic location to ensure that undercover agent would be unknown to anyone in the local law enforcement community. Agents conducted surveillance on Randy McCallum and verified that he was located inside of the shop that he owns. The undercover ISP officer then drove his vehicle down

21

the roadway, just past McCallum's shop, at which time _____ activated his/her emergency lights and conducted an entirely staged traffic stop. McCallum came outside the building and watched _____ place the driver in handcuffs, and then subsequently release the driver with no charges.

McCallum called _____ immediately after the traffic stop ended and directed _____ to pull his/her patrol car around behind a house. _____ did as instructed. McCallum asked _____ about the stop. _____ showed McCallum a large pile of United States currency totaling $2,060.00, that _____ purportedly seized as possible drug money; when in reality, the bills were official advanced funds whose serial numbers had been pre-recorded. _____ told Randy McCallum that the vehicle smelled of marijuana and that the driver claimed to be from the Chicago area. Additionally, _____ ___ said that the driver admitted to being wanted on warrants, and that the driver begged him/her not to take him to jail, suggesting that _____ should just keep the money he/she had seized from the driver's pockets in return for not arresting him. McCallum instructed _____ to keep the money concealed down by his/her leg while they were counting it. Before taking the money, McCallum asked _____ if he/she was working with "them people" (meaning working for federal law enforcement). _____ said that he/she was not, and asked McCallum if he wanted to pat him/her down. After _____ __ assured McCallum that he/she was not working with "them people," the mayor asked if they could split the money. The cash was split between the officer and the mayor. _____ kept $1,000 and McCallum kept $1,060. The incident was audio and video recorded by _____ _____ subsequently returned his/her "cut" of the money to the FBI, and the serial numbers were verified.

49. On June 16, 2010, _____ received a call from mayor who told him/her that he got "1" (meaning one thousand dollars) out of the split. McCallum spoke to _____ from his

22

cellular telephone while he was buying electrical outlets for his mother's house at an area Home Depot. ▮▮▮▮ knew that McCallum usually shopped at the Home Depot located in Belleville, Illinois. Your Affiant verified that there is Home Depot located in Belleville at 5501 Belleville Crossing, Belleville, Illinois. When agents learned that McCallum had been shopping at the Home Depot, your Affiant promptly proceeded to the location to further investigate the purchase. The store operations manager agreed to allow agents to examine the serial number all of the cash that remained in the store. Agents recovered four $5 bills with serial numbers matching the official advanced funds used in the undercover operation on the previous day; thereby verifying that McCallum had spent a portion of the cash he received from ▮▮▮▮ on personal expenditures.

50. July 8, 2011, ▮▮▮▮ worked 12 hours but was paid for 28 hours. ▮▮▮▮ told McCallum about the overpayment, and he replied, "that's alright, you owe me a bottle," meaning that ▮▮▮▮ could keep the extra pay and that he/she could thank McCallum by purchasing him a bottle of liquor. McCallum did not explicitly say why he was rewarding ▮▮▮▮ with 16 extra hours of pay.

51. On July 19, 2011, an FBI Task Force Officer (TFO) prepared approximately 13 grams of an off-white chunky substance that was made to resemble crack cocaine. ▮▮▮▮ drove past a location where McCallum was known to be located and he/she saw McCallum standing outside. The officer motioned for McCallum to come to his/her squad car. When McCallum arrived, ▮▮▮▮ told McCallum that he/she "got some shit" and showed him the purported crack cocaine that was placed inside a popcorn bag. McCallum asked ▮▮▮▮ where it came from, and ▮▮▮▮ responded that he/she had conducted a traffic stop on a guy from Missouri inside of an Alorton public housing project called the Gray Stone. ▮▮▮▮ claimed to

see the driver trying to hide something and found the money and drugs. ▆▆▆ claimed that he/she took the money and drugs but let the driver go.

McCallum and ▆▆▆ left and went to Grand and 38th Street where they parked the police car under a street light. McCallum put the money and drugs on the squad car. The mayor asked ▆▆▆ if he was wearing a wire, and falsely stated that his name was Johnny Bowls (phonetic) (the conversation was video recorded so there is no question about who was present). During this conversation, ▆▆▆ received a phone call at approximately 10:32 PM, from ▆▆▆ who is an inmate in a federal prison. The mayor took the phone and spoke to ▆▆▆ asking the federal prisoner whether ▆▆▆ was "legit" (meaning trustworthy, or safe to deal with). ▆▆▆ vouched for ▆▆▆, and McCallum responded that he was comfortable dealing with ▆▆▆.

After that conversation, ▆▆▆ and McCallum counted the money, which totaled $470 in official advanced funds. McCallum took $200 and all of the drugs. ▆▆▆ returned the other $270 to your Affiant. McCallum advised that he would get the drugs on the street and would have it sold by Friday; and that he would pay ▆▆▆ $100 after it was sold. ▆▆▆ then took McCallum back to his store where McCallum exited the police car.

Roughly two hours later, McCallum called ▆▆▆ cell phone in the presence of your Affiant. Using somewhat coded language, McCallum advised that the crack cocaine was not real. McCallum said that he "gave it to ▆▆▆ who tried to "fire it up but it would not burn." This language is consistent with a slang description of attempting to light crack cocaine that turned out to be a look-alike substance. ▆▆▆ acted surprised and asked ▆▆ mayor if he was "for real." McCallum emphasized that he was not joking and that he wouldn't call at this time of night if it was not true. McCallum said that ▆▆▆ could have the fake drugs

24

back if he/she wanted. ▇▇▇ expressed disappointment that he/she would not be getting paid for the drugs and said "at least we got some money." The mayor became clearly agitated at how openly ▇▇▇ was speaking on the phone, and told ▇▇▇ that he/she talks too much. ▇▇▇ acknowledged fault and McCallum immediately changed the subject to talk about police business.

52.     On September 20, 2011, your Affiant and IRS/CI Special Agent Brad Roessler interviewed Mayor Randy McCallum. During the interview McCallum was asked whether he had any knowledge of any police officers taking money or drugs while on duty. Mayor McCallum falsely stated that he is unaware of any officers taking money or drugs from individuals. McCallum subsequently stated that he recalled a complaint that prior VOAPD Chief Corey Allen had stolen "a pound of weed" at a traffic stop and did not write a report about the situation.

### VOAPD Chief Michael Baxton

53.     Numerous VOAPD officers explained that once police evidence is seized that it is booked into to evidence and locked in a locked file cabinet that is only accessible by the Chief of Police. Additionally, Chief Baxton had video cameras installed inside of the VOAPD after he was made chief to monitor access within the VOAPD. For those reasons, the VOAPD officers believe that Baxton must be complicit in stealing any drugs and money that are taken from the VOAPD police department and do not get sent to the ISP forensics lab.

54.     As described more fully, *supra,* on July 19, 2011, ▇▇▇ showed Randy McCallum a substance that looked like crack cocaine and $470 in United States Currency that were supposedly seized as evidence during a traffic stop. ▇▇▇ kept $270, while McCallum took $200 and the purported crack cocaine to be resold on the street. After they split the

proceeds, ███████ drove McCallum back to the store that McCallum owns. ███████ stated that after McCallum got out of the car, that he put his foot on the bumper of the squad car and placed the purported drugs into his sock. ███████ said VOAPD Chief Michael Baxton was present at this point, and in ███████ opinion would have been able to see what McCallum was doing. Baxton did not ask any questions.

55.    Federal authorities decided to conduct a proactive integrity-test operation on October 5, 2011.  Agents arranged for a federally owned covert vehicle to be registered to a fictitious Illinois business and be entered into the National Crime Information Center (NCIC) database as stolen.  The car was placed at the edge of a vacant lot near Racetrack Drive in Alorton, Illinois, which is relatively close to Interstate 255. While on routine patrol, ███████ radioed that he/she was flagged down by a pedestrian and alerted to the presence of an abandoned vehicle.  Chief Baxton was working that day and chose to respond to the scene. Baxton incorrectly believed that the vehicle had been used in a recent carjacking.  A search of the VIN number revealed that the car was supposedly stolen from Columbia, Illinois.  Baxton called the Metro East Auto Theft Task Force, but they were unable to respond.  Baxton called the Columbia Police Department and learned that the car was supposed to contain a laptop computer and a planner.  Baxton reported that the only items in the passenger compartment were a shirt and a toiletry bag.

Chief Baxton advised ███████ to check for the keys to the car and to pop the trunk.  Upon opening the trunk Baxton observed five (5) XBOX 360 video gaming consoles (hereinafter, also referred to as "gaming consoles" or "Microsoft consoles"), which were previously placed in the vehicle by agents of the Public Corruption Task Force.  Four (4) of these gaming consoles were in sealed brown carton boxes containing two consoles each, while one (1) of the gaming consoles

was in a "broken" carton with only one game. Baxton, instructed ████ to open the sealed boxes with his knife. The gaming consoles were purchased by the FBI for this operation, and cost $399.99 each (plus tax). The federal property was placed in the trunk of the purportedly stolen car for purposes of conducting the integrity test operation.

Chief Baxton was on a telephone call when the discovery was made. He directed ████ ██ to take the XBOX 360 gaming consoles out of the trunk and place them in the trunk of Baxton's police car. The XBOX 360 gaming consoles were not photographed, documented, or processed as evidence in any way. Four consoles were put into Baxton's police car; and Baxton told ████ that the fifth console was his/hers. Baxton told ████ to take it home. ████ placed the fifth console in his car and took it home, as directed. As ████ was preparing to leave the scene, Baxton told him/her not to "open your motherfuckin' mouth to nobody … nobody … nobody." After ████ left the scene, Baxton called him/her and instructed ████ to get rid of the box. Agents instructed ████ kept the device at his/her home and to learn how to play it as a precaution in case Baxton tested his/her familiarity with the game. ████ has subsequently returned the device to the FBI.

████ began to prepare a VOAPD tow sheet at the scene, but Chief Baxton said that he would finish it. That tow sheet listed the contents of the vehicle prior to it being towed by Act Now Towing. Baxton completed the portion of the tow sheet that contained an inventory for the contents that were present inside the vehicle. Baxton identified the contents of the vehicle as follows: "bag of clothes green in color pair pants & shirt on hanger." (The inventory is listed under the section titled "Parts Obviously Missing" - but it is obvious that the inventory was simply written in the wrong space on the tow sheet. The section on this report entitled "List of Personal Effects" was left blank.) The XBOX 360 gaming consoles were not listed anywhere on

the tow sheet. Neither officer completed a narrative police report; and the tow sheet was the only documentation supplied to the Columbia Police to document the recovery of the vehicle. The XBOX 360 games were never reported as recovered to either the Columbia Illinois Police Department or the Alorton Police Department.

56.     Later on October 5, 2011, ██████ received a text message from Baxton asking if he/she could meet him/her. ██████ met with Baxton and asked ██████ if he/she wanted one more of the XBOX 360 gaming consoles. ██████ said yes; however, Baxton never gave ██████ █ a second XBOX 360 gaming console. Therefore, four of the gaming consoles were taken by Baxton and were unaccounted for. Baxton directed ██████ that if the Columbia Illinois Police Department called that ██████ should tell them the only thing in the vehicle was the duffle bag and clothes. Baxton advised he was going to use at least one of the XBOX 360's as a gift for █ ██████.

57.     Subsequently, ██████ spoke with Chief Baxton who said several times not to "say "shit" to nobody." Baxton advised ██████ that he didn't want to be in the newspaper. Chief Baxton advised ██ █ "this ain't shit, I'm gonna put you on real shit, teach you how to be real police."

58.     In the following days, ██████ engaged in several recorded conversations with Chief Baxton about playing games on the XBOX 360 gaming consoles. Baxton stated that he was using one of the consoles in his home and acknowledged that his son was also playing the device. They discussed buying bigger flat screen televisions to better display the gaming system. On October 7, 2011, Baxton reiterated to ██████ not to tell anyone about what had happened. Baxton lives at ███ Church Road, Centreville, IL. 62207. Baxton was interviewed as part of an unrelated federal investigation and has provided ████ Church Road, Centreville, IL. 62207, as

his personal address.  Agents have also conducted a public records search with the St. Clair County Assessor's Office that further corroborated that Michael Baxton owns the property located at ▇▇ Church Road.  It should be noted that county records identify that address as an East St. Louis address, in the Cahokia school district, located in Centreville Township.  However, agents have surveilled the residence and saw Baxton standing on the back deck of the property.

59.    XBOX 360 gaming consoles can be played as a stand-alone gaming system or they can be connected to the internet (through a wired or wireless network) and played against people online.  Each XBOX 360 game console has a unique serial number that was recorded prior to the operation.  This serial number allows the manufacturer, The Microsoft Corporation, to track these devices if they are connected to the internet.

60.    After the government-owned XBOX 360's were stolen, authorities began issuing subpoenas to the Microsoft Corporation to see if any of the Microsoft consoles were being played over the internet.  Subpoenas were issued for the four serial numbers that Chief Baxton took, which include: S/N: 607905110205, 608199210205, 608095710205, 608250710205.  Microsoft Corporation records revealed an Internet Protocol (IP) address of ▇▇▇▇▇▇ was using the stolen XBOX 360 device with a serial number of 608095710205 over the internet.  A trace of the IP address revealed that it was registered to Charter Communications.

61.    A subpoena was issued to Charter Communications to identify the subscriber using IP address ▇▇▇▇▇▇.  Charter records revealed that IP address ▇▇▇▇▇▇ is registered to ▇▇▇▇▇▇, at ▇▇ ▇▇▇ ▇▇▇ Alorton, Illinois.  ▇▇▇▇▇▇ is ▇▇▇▇▇▇ ▇▇▇ ▇▇▇▇▇▇ has maintained Charter Internet service at his residence since September 4, 2009, according to Charter records.  Microsoft and Charter records show one of the stolen XBOX 360 consoles is now being used over the internet at the residence

29

of ███████████████████████, Alorton, Illinois.  Agents confirmed ████████████

address through ███████████████████████████████████████████████

███████████████████████████████

### Other Obstructive Conduct:

62.   

63.   On September 1, 2011, ████████ discussed the fact that the VOA had received a subpoena from the FBI, and McCallum said not to talk to the FBI without an attorney.

64.   On September 22, 2011, McCallum advised ████████ that the "feds' may be trying to set someone up, and McCallum advised ████████ to run his cases straight for a while.

### Smuggling Contraband:

65.   As described, *supra,* Mayor Randy McCallum Sr. has a son named Randy McCallum, Jr.  The mayor's son was arrested on December 8, 2009, for the September 18, 2009, double murder of Kevin McVay and Charles Black, who were both gunned down in Washington Park.  McCallum Jr. has remained in custody in the St. Clair County Jail while he continues await trial.

66. ████████████████████████████ ██████ ████████

employed full-time as a correctional officer in the St. Clair County Jail. During the time period of April-May, 2011, Mayor Randy McCallum had some conversations with ██████ about engaging in unlawful activity. During that time period, it appeared to your Affiant that McCallum Sr. was grooming ██████ to engage in illegal activity or was otherwise testing his/her trustworthiness as a criminal conspirator.

67. March 22, 2011, McCallum Jr. gave ██████ a note to give to his father asking for "ports," meaning Newport cigarettes.

68. McCallum Sr. asked ██████ to smuggle cigarettes into the jail to his son. Your affiant contacted the St. Clair County Jail administrative staff to seek authorization to allow ██████ ██ to engage in activity that would otherwise be prohibited. The jail approved the request, and ██████ was permitted to cigarettes into the jail to McCallum, Jr. ██████ has taken cigarettes to Randy McCallum, Jr. on three different occasions, with approval of the jail.

a. April 20, 2011, Mayor gave ██████ a pack of cigarettes to give to his son.

b. June 6, 2011, Mayor gave ██████ a pack of cigarettes to smuggle into the jail.

c. August 25, 2011, Mayor gave ██████ a pack of red Newport cigarettes and told ██████ "don't get caught with this shit."

69. On May 11, 2011, McCallum Jr. asked ██████ to bring in some green (street slang for marijuana). ██████ told him to talk to his dad and left the matter open. On June 8, 2011, McCallum Jr. offered to pay $100 to ██████ for each ounce of marijuana that he/she brought into the jail. That conversation was not recorded ████████████████████████████ ████████████████

70.     On September 15, 2011, ███ gave McCallum Jr. the pack of Newport red cigarettes in his maximum security cell.  McCallum Jr. said he was going to talk to his dad about getting him a cell phone.

71.     On December 6, 2011, McCallum Jr. called ███ from inside the jail and used coded language (because outgoing calls from the jail are recorded) to ask ███ ██ ██ bring marijuana and cigarettes into the jail for his birthday, which was going to occur on Dec. 15. McCallum Jr. asked him about bringing it "both ways" to let ███ know that he wanted cigarettes and marijuana.

72.     On December 12, 2011, McCallum Sr. provided ███ with a pack of cigarettes and a "blunt" (a cigar laced with marijuana) to smuggle into the St. Clair County Jail to his son Randy McCallum Jr.  ███ went to McCallum Sr.'s store and received the cigarettes from ███ After a VOA meeting, the ███ met McCallum Sr. at the mayor's home. They went into the house and McCallum Sr. went into a back room.  When he returned from the back room, the mayor was in possession of a blunt to be smuggled into the jail for McCallum Jr.

73.     On January 3, 2012, agents conducted a field test on the blunt, which tested positive for the presence of marijuana.

74.     The possession of tobacco products and marijuana are prohibited within correctional institutions.  Items of contraband that are bought and sold within a correctional facility threaten the order, discipline, and security of the institution.  This is true for a number of reasons, including the nature of the activities that accompany the clandestine acquiring, smuggling, storage, sale, distribution and use of contraband.

75.     The United States Marshal Service has entered into an intergovernmental agreement with St. Clair County for the housing, safekeeping and subsistence of adult male and

female federal prisoners who have been charged with or convicted of violations of federal law, or who are being held as material witnesses in the St. Clair County Jail. Captain Steven Johnson is an administrator at the St. Clair County Sheriff's Department who has responsibilities for the proper administration of the jail. Capt. Johnson advised that federal prisoners are generally housed separately from state and local detainees; however state and federal inmates do interact with one another on occasion because they access the same hallways and facilities within the institution.

**Firearms:**

76.     On December 29, 2011, ▮▮▮▮ was located in the VOA village hall in the mayor's office along with ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, Mayor Randy McCallum and ▮▮▮▮▮▮▮▮▮▮▮. During the conversation McCallum told ▮▮▮▮ that he needed some bullets for New Year's Eve.

77.     When asked what type of ammunition he needed, McCallum admitted to ▮▮▮▮ that the gun was a .380 caliber handgun that McCallum had secretly taken out of ▮▮▮▮s car when they had made a trip together to Springfield. McCallum explained that while riding in the car that he had fallen in love with the gun and so he just took it. ▮▮▮▮ told McCallum that the gun might be reported stolen, but that he did not care that McCallum had taken it because the gun was purchased by the VOA. McCallum told ▮▮▮▮ that he had been using the gun ever since he took it, and that the gun "may have two or three bodies on it." That language is common street slang for a gun that has been used to kill someone.

78.     McCallum went on to say that he wanted to buy a very small concealable handgun that is small enough that he could "just walk up and shoot someone in the nose." ▮▮▮▮ stated that on December 29, 2011, that ▮▮▮▮▮▮▮▮ agreed to accompany McCallum to Ron

and Jo's gun shop so that the mayor could purchase a firearm on law enforcement letterhead to avoid the applicable three-day waiting period and make a cash-and-carry purchase on the same date.

### Residence of Randy McCallum Sr. – █ So. 42nd Street, Alorton:

79.     On July 15, 2011, █████ stated that he believes that the mayor is dealing drugs and he stated that a safe, or vault, had been built into the floor of McCallum's dining room. ████ █ stated that he/she saw the location of the safe during its construction.  The safe is covered with a rug in the dining room.

80.     In a conversation with ██████ the mayor was discussing firearms and he discussed a "pipe pistol" that his father had given him that he keeps in the safe at his house.  This corroborates other witnesses, including██████ who have told agents that McCallum has a safe in his home.  McCallum admitted to stealing a .380 caliber firearm from ██████████ ████ and stated that he has been using that firearm as his own ever since taking it.  Your Affiant knows that it is extremely common for individuals to keep the firearms that they own or possess in their own homes.

On December 1, 2011, █████ reported that he was at Mayor McCallum's house on Thanksgiving around 6 or 7 PM.  When █████ walked in the residence he/she observed approximately 15 "rocks" that based upon size, color and appearance appeared to be crack cocaine, located on a table in the kitchen.  █████ estimated that the rocks appeared to be typical of those that are sold in the Alorton area, with an estimated street value of $20 a rock.  There was a plastic bag next to the crack cocaine.  A straight edge razor was on a plate next to the crack cocaine.

No one spoke about the items on the table, but it was obvious to█████ that it was crack

cocaine. Gwendolyn McCallum covered the crack rocks up as soon as ███ walked into the room and did not speak about them.

81.     Further, on December 12, 2011, McCallum delivered marijuana to ███ to be smuggled into the St. Clair County Jail. That marijuana was stored in McCallum's home prior to being given to ███.

### Village of Alorton Village Hall - 4821 Bond Avenue, Alorton, IL

82.     ███ also informed agents that the Village of Alorton, Illinois had a Digital Video Recorder (DVR) surveillance system installed. The affiant believes this system has the potential to capture Baxton, Sr. arriving at the Alorton Police Department and entering the XBOX 360 games into evidence. ███ advised agents Baxton has remote access to this system and is able to control it from his home computer. This also allows Baxton to view the system from remote locations in addition to his home. The system installed includes multiple cameras and at least one 16 channel DVR to record the cameras. This system can be viewed on any internet connected computer in the police department. It is known to the affiant this type of surveillance systems often allow viewers to view and save information from cellular telephones and internet connected computers.

83.     Michael Baxton, Sr. was employed as the Police Chief of Alorton, Illinois at the time of this operation. The XBOX 360 gaming consoles placed in the trunk of Baxton's police vehicle should have been either been turned over to the Columbia Police Department or entered into evidence and taken to the Alorton Illinois Police Department evidence room. ███ took custody of one of the XBOX 360s per Michael Baxton instructions and this device is now in the custody of the FBI. Microsoft Global Criminal Compliance provided records which ultimately

35

showed that one of the XBOX 360 devices is being used at ▮▮▮▮▮▮▮ residence, ▮▮▮

▮▮▮ Avenue, Alorton, Illinois. Baxton has indicated he is using one of the XBOX 360s at his

residence located at ▮▮▮ Church Road, Cahokia, Illinois. Two of the remaining four XBOX

360s are unaccounted for.

84.     Similarly, other property – such as US Currency, drugs, and counterfeit

substances seized by police and described in this application should have been entered into

evidence at the Alorton Police Department.

85.     Evidence is maintained in multiple locations at the Alorton Police Department.

The basement of the Alorton Village Hall is controlled by the police department. Property

maintained as evidence could be stored in other locations within the police department including

but not limited to: the three evidence storage rooms in the basement. One of these rooms is in

the Chief's office, and the other two rooms have doors accessible from the open areas of the

police department.

86.     In addition to the basement of the Alorton Village Hall, one Alorton Police officer

has an office on the main floor of the village hall. Inside this office is a vault that is used to store

evidence. It is possible property described in this application could be stored in this location too.

87.     Activity within the police department and Alorton Village Hall is video recorded

on multiple cameras located throughout the building. These recording devices could potentially

show the arrival and departure of evidence in the Alorton Illinois Police Department facilities.

88.     Police reports are generated in response to incidents such as the recovery any type

of evidence, including stolen vehicles. These reports are generated using personal computers

located in the Alorton Police Department. These computers also store evidence photographs of

items recovered by the Alorton Police Department. Cellular telephones and "smart" phones are

36

also often used to take photos of evidence on location as the memory card in the camera owned by the department is frequently missing.

89.    In order to determine the exact location of the evidence that should be secured as evidence within the VOAPD, such as United States Currency, drugs, 13 grams of an off-white chunky substance resembling crack cocaine, and the missing XBOX 360 gaming consoles and related peripherals, a complete inventory must be completed of the Village of Alorton Police Department evidence rooms.  This inventory will corroborate whether the property described in this application has been stolen or whether the property is being maintained as evidence in the Alorton Police Department.

### Residence of ████████ – ██ █████ Avenue, Alorton, IL

90.    XBOX 360 game counsels have the capability of being played with our without internet service connected to them.  With internet service connected, players are able to play various games with people located all over the world.  Users of the XBOX 360 game counsels are also able to "surf" the internet and do many other task through the internet.

91.    Each XBOX 360 game counsel has a unique serial number located on it.  This serial number allows the manufacturer, The Microsoft Corporation, to track these devices if they are connected to the internet.  Microsoft Corporation records revealed an Internet Protocol (IP) address of ██████████ was using one of the stolen XBOX 360 devices on the internet. Investigative sources indicated this IP address was registered to Charter Communications. Records from Charter Communications revealed the individual who was registered to the IP address ██████████ is ████████, whose ██████ is former VOAPD Chief Michael Baxton ██████████ has Charter Internet service at his residence and has maintained this service since September 4, 2009.  According to Microsoft Corporation and Charter records, one

of the XBOX 360 counsels previously placed in the truck of the car by agents is now being used at the residence of ▬▬▬▬.

92.  As of December 28, 2011, The Microsoft Corporation provided records indicating ▬▬▬▬ is still using the XBOX 360 at his residence located at ▬▬ ▬▬▬▬, Alorton, Illinois.

### Residence of Michael Baxton, Sr. – ▬▬ Church Road, Centreville, IL

93.  Michael Baxton has been in law enforcement for over fifteen years.  Baxton is familiar with standard operating procedures related to handling evidence.  Initially, Baxton instructed ▬▬▬ to use gloves when coming into contact with the "stolen" vehicle and its contents.  Upon discovering XBOX 360s located in the trunk of the vehicle, former Chief Michael Baxton instructed ▬▬▬ to load the XBOX 360s in the truck of his squad car.

94.  Baxton completed an official Alorton Police Department Vehicle Tow-In Recovery Report which shows an inventory of all items that were in the vehicle prior to it being towed.  Baxton left the XBOX 360 game counsels off the tow sheets.  Baxton instructed ▬▬▬ to take the fifth XBOX 360 game counsel to his house and destroy the box.  One of the four XBOX 360 games loaded in the trunk of Baxton's squad car is now activated online at his ▬▬▬ ▬▬▬▬▬ residence.  In a later conversation with ▬▬▬▬ Michael Baxton stated that he was playing one of the gaming consoles in his home, and mentioned that his son was also playing the game.  Baxton also indicated he was considering buying a big screen TV for his home to play the XBOX 360.  For those reasons, it is very likely that at least one of the stolen gaming consoles is located inside of Michael Baxton's home located at ▬▬▬ Church Road, Centreville, Illinois.

## ILLEGAL DRUGS AND RELATED RECORDS AND PARAPHERNALIA

95.    As a result of your Affiant's training and experience, your Affiant is familiar with how various drugs are used, produced, and/or manufactured and the typical distribution and trafficking methods used by drug users, dealers, distributors, and manufacturers (collectively referred to as drug traffickers).  In addition, your Affiant is also familiar with the numerous documents and records generated during the distribution, manufacturing, and trafficking of these controlled substances.  Your Affiant's awareness of these  drug trafficking practices, as well as his knowledge of drug use and distribution techniques as set forth in this Affidavit, arise from your Affiant's training and involvement in  prior drug investigations, as well as information provided to your Affiant by other law enforcement officers when relating the results of their own drug investigations.

96.    As in this case, illegal drug trafficking is a continuing activity over months and even years.  Illegal drug traffickers will repeatedly obtain and distribute controlled substances on a somewhat regular basis, much as any distributor of a legitimate commodity would purchase stock for sale, and similarly such drug traffickers will have an "inventory" which will fluctuate in size depending upon the demand for the product.  In the same respect, much as any distributor of a commodity, drug traffickers will also have a cash "inventory," or amount of United States Currency, which will also fluctuate in size depending upon the sale of the product.

97.    In addition to controlled substances, it is generally a common practice for drug traffickers to maintain records relating to their drug trafficking activities, even though such documents may be in code.  These records are generally kept for a period of time extending beyond the time during which the drug trafficker actually possesses the controlled substances, in order to maintain contact with clients, associates, suppliers, etc., and to ensure future success in

the business. In some instances, these drug related notations and records are maintained electronically, for example, on personal computers, computer disks, tapes, electronic organizers/address books, telephone answering /recording machines, telephone beeper/pager equipment, and telephone caller ID boxes. It has been your Affiant's experience that many such records will be kept close at hand, often at the drug trafficker's residence or stash house, so that the records are readily accessible in order to facilitate the drug trafficking business.

98. Because drug traffickers in many instances will "front" (that is, sell on consignment) these controlled substances, some form of record-keeping is necessary to keep track of amounts paid and owed. Such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep "pay and owe" records, or ledgers, to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's supplier(s). These records are commonly kept for extended periods of time, much the same as a legitimate business might keep records of purchases and suppliers and accounts payable or receivable.

99. Drug traffickers very often place assets in names other than their own, and maintain residences in names other than their own to avoid detection of themselves and/or their assets by law enforcement agencies. Even though those residences and/or assets are in other person's names, the drug dealers continue to use them and exercise dominion and control over them. Drug traffickers will frequently keep and maintain documents indicating ownership or providing descriptions of these assets.

100. During the course of drug related searches, your Affiant and other agents have found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the

articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, videotapes, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

101.  As in this case, it is also a common practice for drug traffickers to conceal at their residences, offices, garages, storage buildings, automobiles, safety deposit boxes, and/or on their persons, large sums of money (generally United States Currency), either the proceeds from drug sales or monies to be used to purchase controlled substances.  Drug traffickers frequently keep on hand quantities of currency in order to maintain and finance their ongoing narcotics business. In this connection, drug traffickers typically make use of wire transfers, cashiers' checks, and money orders to further their drug enterprises.  Evidence of such financial transactions, as well as records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be kept.  It has been your Affiant's experience that drug traffickers often keep the large sums of currency close at hand, often at the location in which they reside to include safes, to oversee and protect the currency from detection and/or theft.

102.  To your Affiant's knowledge, cocaine is not manufactured or cultivated within the Southern District of Illinois.  As a result, individuals involved in the use, distribution, and trafficking of cocaine and crack cocaine must frequently travel outside of the Southern District of Illinois to obtain the drugs.  Consequently, traffickers of cocaine must themselves travel (or pay and arrange for others to travel on their behalf) to or from "source countries," "source states," and "source cities," where large reserves of cocaine are frequently smuggled and stored.  Such travel necessarily results in the generation of various travel documents for the traveler, such as airline or bus tickets, boarding passes, travel itineraries, hotel receipts, credit card receipts, maps, telephone records, written directions, or other items detailing routes utilized during these trips.

41

103.   Drug traffickers frequently take, or cause to be taken, photographs and/or videotapes of themselves, their associates, their property, and their product which they will keep under their control over long periods of time.

104.   In addition to the aforementioned records, it is also a common practice for drug traffickers to maintain items of value, drug paraphernalia, and items necessary to produce a distributable product.  Like drug related records, these items are often kept on a continuous basis for a period of time extending beyond the time which the drug trafficker actually possesses the controlled substances.  This is done to increase efficiency and ensure future success of the drug trafficking business.

105.   Drug traffickers often deal/possess weapons, goods, and/or items of value, to include precious metals and jewelry, and exchange drugs for such items.  Often, these same items are stolen.

106.   Typically, drug traffickers possess firearms and other dangerous weapons to protect their profits, supply of drugs, and persons from competitors and others who might attempt to forcibly take the traffickers' profits and/or supply of drugs.

107.   Because drug traffickers occasionally use their own product and because they frequently employ users of the drug to assist them in their drug trafficking activities, paraphernalia for drug use/abuse are often kept by the drug trafficker on a continuous basis and kept close at hand for use whenever needed.  This paraphernalia includes various types of pipes, syringes, razor blades, straws or "snorting tubes," rolling papers, etc.

108.   Powder drugs such as cocaine are often produced in a high purity form, but rarely consumed by users or distributed by dealers in such high purity form.  Rather, such powder drugs, when ultimately consumed by the user, are at a lower purity level.  High purity powder

42

drugs are reduced in purity by the addition of diluents such as mannitol, mannite, and vitamin B12. This process is called "cutting" or "stepping on" the drug. Other equipment, such as glassware, scales, sifters, grinders, razor blades, glass panes and mirrors, and the like are typically used in this cutting process. Once the drug has been "cut," a usual practice is to weigh the product and repackage it in smaller quantities in plastic bags, balloons, heat-sealed bags, and/or other types of containers for redistribution. Scales and occasionally heat sealers are often used in this process.

109. Cocaine base, commonly referred to as crack cocaine, is generally produced by combining cocaine powder, another substance (generally baking soda), and water in some type of container (often glass or metal). The mixture is then heated using a microwave, stove, or some other heat source. The resulting reaction produces crack cocaine. In a number of searches related to crack cocaine investigations, your Affiant has found large amounts of baking soda. Your Affiant knows that baking soda is maintained on a continuous basis by individuals involved in the production of crack cocaine, so as to more efficiently produce the drug when the cocaine powder is acquired or made available.

110. In an attempt to protect their business, product, and profits from discovery by law enforcement and/or from individuals who would attempt to take, rob, or steal these items, drug traffickers frequently utilize detection devices, such as police scanners, two way radios, motion detectors, video and audio surveillance equipment, etc. These items are also kept and operated on a continuous basis.

111. In a number of searches in prior investigations that your Affiant has been involved in, these enumerated types of evidence have typically been recovered from the main residence and in addition, from other structures and areas on the property being searched, for

example, other storage lockers/areas, detached closets, containers, automobiles, computers, electronic storage devices, and yard areas associated with the main residence and used in connection with or within the curtilage of said residence, as well as from the persons of occupants or individuals located within.

112. In a number of searches executed in connection with the drug investigations in which your Affiant has been involved, or informed of, the items listed in Attachment A have been recovered.

## THEFT AND FRAUD RELATED RECORDS AND EVIDENCE

113. Based upon your affiant's knowledge, training, and experience, including consultations with other agents who are experienced in theft and fraud related investigations, I have reason to believe that people who commit property theft crimes often have in their residence records and documents associated with the offenses and the activities carried out by the person committing the offenses. Proceeds of such thefts or frauds are often kept at residences to be utilized by the subjects or sold / given away at a later date.

114. People who commit financial crimes often have records and documents associated with the offenses and the activities carried out by the person committing the offenses.

115. People who commit financial crimes, like ordinary citizens, often keep certain financial records such as pay stubs, check registers, bank statements, credit card statements, and notes pertaining to financial transactions.

116. People who commit financial crimes, like ordinary citizens, keep calendars and address books, and personal notes pertaining to appointments and personal contacts.

117.  Individuals involved in criminal conspiracies commonly maintain records reflecting names, addresses, and telephone numbers of other co-conspirators.

118.  Individuals involved in financial and financially related crimes often maintain records and documents pertaining to their criminal activity.  These records and documents are normally kept by these individuals in their residence, vehicles, businesses, or on their person, where they may be readily accessible to that individual.  Furthermore, these records are maintained for numerous years.

119.  Individuals who transact business with currency often receive receipts for cash purchases and that receipts are often maintained in their residence, business, or on their person.

120.  The use of mobile telephones, such as Blackberries, iPhones, PDA's, SmartPhones, and other data organizing phones with features such as internet, instant messaging, and text messaging are prevalent in today's society.  I know that these mobile phones are capable of storing calendar items, task items, text messages, address books, and other contact information.

121.  The above facts provide probable cause to believe that in the Southern District of Illinois, within the premises identified as

Alorton Illinois Village Hall
4821 Bond Avenue
Alorton, IL  62207
and

Residence of Michael Baxton, Sr.
███ Church Road
Centreville, IL  62207
and

Residence of ████████
███  ████ Avenue

45

Alorton, IL 62207

and

Residence of Randy McCallum
█ So. 42nd Street
Alorton, IL 62207

there is located the items set forth in Attachment "A" which is evidence of violations of Title 18

United States Code, Sections 371 (conspiracy to unlawfully obtain a firearm in violation 18

U.S.C. §922(a)(6) and §924(a)(1)(A)); 641 (theft or conversion of government property); 922(j)

(possession of a stolen firearm); 1001 (making false statements); 1343 (wire fraud); 1519

(obstruction of justice); 1791 (attempting to provide contraband to an inmate of a penal facility

in which persons are held in custody pursuant to an agreement with the Attorney General); 1951

(Hobbs Act); and Title 21, Sections 841(a)(1) and 846 (attempted possession with the intent to

distribute a controlled substance), within the scope of Rule 41(c) of the Federal Rules of

Criminal Procedure as property subject to search and seizure.

### Special Needs and Justification to Seize Computers and Related Hardware and Electronic Storage Device Found on Premises for Off-Site Examination

Based upon my knowledge, training and experience, and that of other FBI personnel with

whom I have consulted, on my participation in this investigation, and the facts described above, I

know that searching and seizing information from computers often requires agents to seize most

or all electronic storage devices (along with related peripherals) to be searched later by a

qualified computer expert in a laboratory or other controlled environment. This is true because of

the following:

(1) The volume of evidence. Computer storage devices (like hard disks, diskettes, tapes,

laser disks, and compact disks, thumb drives, smart phones, memory cards) can store the

equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence by storing it in random order with deceptive file names. This may require the searching authorities to examine all the stored data to determine which particular files are evidence, fruits and/or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical and invasive to attempt this kind of data search on-site.

(2) Technical Requirements. Searching computer systems for criminal evidence is a highly technical process requiring expert skills and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data. In any event, however, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password-protected, or encrypted files. Because computer evidence is vulnerable to inadvertent or intentional modification or destruction (either from external sources or from destructive code imbedded in the system as a "booby trap"), a controlled environment may be necessary to complete an accurate analysis. Further, such searches often require the seizure of most or all of a computer system's input/output peripheral devices, related software, documentation, and data security devices (including passwords) so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment.

In light of these concerns, I hereby requests the Court's permission to seize the computer hardware and digital memory devices that cannot be readily imaged (and associated peripherals) that are believed to contain some or all of the evidence described in the warrant, and to conduct

47

an off-site search of the hardware for the evidence described, if, upon arriving at the scene, the agents executing the search conclude that it would be impractical to search the computer hardware on-site for this evidence. Computers, electronic memory devices, and any server drives will be mirror imaged and returned as quickly as possible. Documents taken will be copied as soon as practicable.

FURTHER AFFIANT SAYETH NAUGHT

Joseph R. Murphy, Special Agent
Federal Bureau of Investigation

Sworn to before me, and subscribed in my presence on the 4th day of January, 2012, at East St. Louis, Illinois.

HON. DONALD G. WILKERSON
United States Magistrate Judge